UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

IN THE MATTER OF THE SEARCH OF
122 Kelly Street, Panama City Beach,
Florida, 32413

Case No. 5:20-mj-54-MJF

**Filed Under Seal**

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANT

I, Stephen Troy Ward, a Special Agent with the Federal Bureau of Investigation ("FBI") being duly sworn, depose and state as follows:

1.    I have been employed as a Special Agent of the FBI since October 27, 2019, and I am currently assigned to the Jacksonville Division, Panama City Resident Agency. During this time, I have conducted and assisted with two local investigations related to the possession, receipt and distribution of child pornography. I have gained experience through training provided by the FBI and everyday work relating to conducting these types of investigations.

2.    As a Federal Agent, your Affiant is authorized to investigate violations of laws of the United States and is a law enforcement officer with the authority to execute warrants issued under the authority of the United States. I have participated in the execution of a consent search on a residence wherein child pornography was recovered followed by a later arrest of the possessor of the child pornography by local authorities. I have had numerous conversations with experienced agents

1

regarding child pornography investigations and the many different enforcement methods used to combat child pornography and the internet exploitation of children. The FBI online covert employee, ("OCE"), who provided information to your Affiant on this case, is a member of the FBI's Child Exploitation Human Trafficking Task Force and is an experienced agent in matters relating to child pornography.

3.     I present this Affidavit in support of an application for a warrant to search and to seize relevant evidence found within the following residence, located within the Northern District of Florida (more fully described in Attachment A): the garage house located at 122 Kelly Street, Panama City Beach, Florida 32413 (hereinafter "SUBJECT PREMISES").

4.     Pursuant to Rule 41 of the Federal Rules of Criminal Procedure, I seek authority to search the above-identified property for evidence, fruits, and instruments related to the unlawful activities described in this Affidavit. The activities are believed to be in violation of federal law, which includes, but is not limited to, violations of 18 U.S.C. §§ 2252A(a)(2) and 2252A(a)(5)(B), which make it a crime to receive and distribute child pornography and to possess child pornography and access with intent to view child pornography, respectively. The violations and the basis for the search are more fully described below, and the specific items to be searched for and seized at each location are more fully described in Attachment B.

5.     The information contained within this Affidavit is based on my training and experience, as well as information I have developed, and information related to me by other law enforcement officers. Because this Affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation.

## DEFINITIONS

6.     The following definitions apply to this Affidavit and Attachment B to this Affidavit:

7.     "Child Pornography" includes the definition in 18 U.S.C. § 2256(8) (any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct).

8.     "Visual depictions" include undeveloped film and videotape, and data stored on computer disk or by electronic means, which is capable of conversion into a visual image. See 18 U.S.C. § 2256(5).

9.     "Child Erotica" means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not, in and of themselves,

obscene or that do not necessarily depict minors in sexually explicit poses or positions.

10.    "Minor" means any person under the age of eighteen years. See 18 U.S.C. § 2256(1).

11.    "Sexually explicit conduct" means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals or pubic area of any person. See 18 U.S.C. § 2256(2).

12.    "Internet Service Providers" or "ISPs" are commercial organizations which provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers, including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment. ISPs can offer various means by which to access the Internet including telephone-based dial-up, broadband based access via a digital subscriber line (DSL) or cable television, dedicated circuits, or satellite-based subscription. ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth that the connection supports. Many ISPs assign each subscriber an account name such as a user name or screen name, an e-mail address, and an e-mail mailbox, and the subscriber typically creates a password for the account. By using a computer

equipped with a telephone or cable modem, the subscriber can establish communication with an ISP over a telephone line or through a cable system and can access the Internet by using his or her account name and password.

13. "Domain Name" refers to the common, easy to remember names associated with an Internet Protocol address. For example, a domain name of "www.usdoj.gov" refers to the Internet Protocol address of 149.101.1.32. Domain names are typically strings of alphanumeric characters, with each level delimited by a period. Each level read backwards – from right to left – further identifies parts of an organization. Examples of first level or top-level domains are typically .com for commercial organizations, .gov for the governmental organizations, .org for organizations, and, .edu for educational organizations. Second level names will further identify the organization, for example, usdoj.gov further identifies the United States governmental agency to be the Department of Justice. Additional levels may exist as needed until each machine is uniquely identifiable. For example, www.usdoj.gov identifies the World Wide Web server located at the United States Department of Justice, which is part of the United States government.

14. "Log Files" are records automatically produced by computer programs to document electronic events that occur on computers. Computer programs can record a wide range of events including remote access, file transfers, logon/logoff times, and system errors. Logs are often named based on the types of information

they contain. For example, web logs contain specific information about when a website was accessed by remote computers; access logs list specific information about when a computer was accessed from a remote location; and file transfer logs list detailed information concerning files that are remotely transferred.

15. "Hyperlink" refers to an item on a web page which, when selected, transfers the user directly to another location in a hypertext document or to some other web page.

16. "Website" consists of textual pages of information and associated graphic images. The textual information is stored in a specific format known as Hyper-Text Mark-up Language (HTML) and is transmitted from web servers to various web clients via Hyper-Text Transport Protocol (HTTP).

17. "Uniform Resource Locator" or "Universal Resource Locator" or "URL" is the unique address for a file that is accessible on the Internet. For example, a common way to get to a website is to enter the URL of the website's home page file in the Web browser's address line. Additionally, any file within that website can be specified with a URL. The URL contains the name of the protocol to be used to access the file resource, a domain name that identifies a specific computer on the Internet, and a pathname, a hierarchical description that specifies the location of a file in that computer.

18. The terms "records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade form (including, but not limited to, writings, drawings, painting), photographic form (including, but not limited to, microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies), mechanical form (including, but not limited to, phonograph records, printing, typing) or electrical, electronic or magnetic form (including, but not limited to, tape recordings, cassettes, compact discs, electronic or magnetic storage devices such as floppy diskettes, hard disks, CD-ROMs, digital video disks (DVDs), mobile telephone devices, video gaming devices, portable music players, Personal Digital Assistants (PDAs), Multi Media Cards (MMCs), memory sticks, optical disks, printer buffers, smart cards, memory calculators, electronic dialers, or electronic notebooks, as well as digital data files and printouts or readouts from any magnetic, electrical or electronic storage device).

## BACKGROUND REGARDING THE INTERNET/COMPUTERS AND
## CHILD PORNOGRAPHY

19. Based upon my training and experience in child exploitation and child pornography investigations, and the experience and training of other law enforcement officers with whom I have had discussions, I know that computers and computer technology have revolutionized the way in which individuals interested in

child pornography interact with each other. Child pornography formerly was produced using cameras and film (either still photography or movies). The photographs required darkroom facilities and a significant amount of skill in order to develop and reproduce the images. There were definable costs involved with the production of pornographic images. To distribute these on any scale required significant resources. The photographs themselves were somewhat bulky and required secure storage to prevent their exposure to the public. The distribution of these wares was accomplished through a combination of personal contacts, mailings and telephone calls. The development of computers has changed this. Computers basically serve four functions in connection with child pornography: production, communication, distribution, and storage.

20. Child pornographers can now transfer photographs from a camera onto a computer readable format with a device known as a scanner. With the advent of digital cameras, the images can now be transferred directly onto a computer. A device known as a modem allows any computer to connect to another computer through the use of telephone, cable, or wireless connection. Electronic contact can be made to literally millions of computers around the world.

21. The computer's ability to store images in digital form makes the computer itself an ideal repository for child pornography. The size of the electronic storage media (commonly referred to as the hard drive) used in home computers has

grown tremendously within the last several years. These drives can store thousands of images at very high resolution.

22.     The Internet and its World Wide Web afford collectors of child pornography several different venues for obtaining, viewing and trading child pornography in a relatively secure and anonymous fashion.

23.     Collectors and distributors of child pornography also use online resources to retrieve and store child pornography, including services offered by Internet Portals such as Yahoo! and Hotmail, among others. The online services allow a user to set up an account with a remote computing service that provides e-mail services as well as electronic storage of computer files in any variety of formats. A user can set up an online storage account from any computer with access to the Internet. Evidence of such online storage of child pornography is often found on the user's computer. Even in cases where online storage is used, evidence of child pornography can be found on the user's computer in most cases.

24.     As is the case with most digital technology, communications by way of computer can be saved or stored on the computer used for these purposes. Storing this information can be intentional, i.e., by saving an e mail as a file on the computer or saving the location of one's favorite websites in, for example, "bookmarked" files. Digital information can also be retained unintentionally, e.g., traces of the path of an electronic communication may be automatically stored in many places (e.g.,

9

temporary files or ISP client software, among others). In addition to electronic communications, a computer user's Internet activities generally leave traces or "footprints" and history files of the browser used. A forensic examiner often can recover evidence suggesting whether a computer contains wireless software, was using an online messenger, and when certain files under investigation were uploaded or downloaded. Such information is often maintained indefinitely until overwritten by other data.

25.    As part of undercover investigations, law enforcement agents have devised a number of pro-active investigative techniques aimed at identifying and investigating individuals involved in the sexual exploitation of minors through the production, distribution, receipt and possession of child pornography and the attempts thereto.

## BACKGROUND OF THE INVESTIGATION AND PROBABLE CAUSE

26.    On February 24, 2020, Online Covert Employee (OCE), who is a member of the FBI Child Exploitation Human Trafficking Task Force in Salt Lake City, Utah, was connected to the Internet in an online undercover capacity. A software program was used to record the online activity, chats, and images identified within LiveMe, and to identify individuals who were involved with the sexual exploitation of children.

27.     LiveMe is a free mobile application that can be downloaded on Android or iOS devices that permits users to stream live video of themselves to an anonymous audience of fellow LiveMe users. The LiveMe audience can post comments and interact with people in the video, including give instructions or commands to the user. This application also allows users to create groups where like-minded individuals can chat/text other users and post videos/images. These groups of like-minded individuals set up FAM chatrooms. For users to access a FAM chatroom, the creator or a group member must send an invitation to the LiveMe user. A FAM chatroom, according to LiveMe's website "is a new space exclusively belonging to you and your friends. In a FAM, you can chat, post pictures, and watch broadcast together! And Surely, More..." [1] LiveMe creates a unique identifier, typically a string of numbers, for each user. Each user has the ability to create a screen name which can be changed at any time.

28.     On February 24, 2020, an individual with the LiveMe profile identifier "8998729," using the screen name Best Links was found to have a sexual interest in children. During the course of this online undercover session, it was identified that this LiveMe user was a member of known child pornography groups titled "Trade and share nűűd," "NoLimit!!!," "join," and multiple other known child pornography groups. Members within these groups distributed thousands of videos/images of

---

[1] LiveMe https://www.liveme.com/activity/2017/fam/index.html link describing FAM Chatrooms.

child rape, described as nude prepubescent age children, including infants and toddlers, engaged in sexual acts with adults and other children.

29.     On February 24, 2020, LiveMe profile identifier "8998729," using the screen name Best Links posted a Mega.nz link to the FAM chatroom "join." The profile picture for the group depicted a prepubescent or pubescent (teenager or age difficult) girl posing nude in front of a mirror. The Mega.nz link posted by profile ID "8998729" contained videos of pubescent (teenager or age difficult) girls dancing nude, masturbating, engaging in sexual intercourse, being sexually abused, or having sexual acts with dogs. There is a video of a prepubescent girl being sexually abused in the Mega.nz link by an adult. Mega.nz is a cloud storage and file hosting service offered by Mega Limited, which is based in New Zealand. The service is offered primarily through web-based apps.

30.     A subpoena to LiveMe submitted by the OCE on February 23, 2020 requesting subscriber data for this account was issued. The response from LiveMe identified the most recent and consistent IP addresses logging into this account at the time of the subpoena request belonging to Wide Open West (WOW) internet. LiveMe subscriber data revealed the following: USERNAME: Best Links; SID: 8998729; REGISTRATION DEVICE: iPhone; EMAIL: fanticshd@gmail.com; IP ADDRESSES: 24.96.246.251(WOW).

31.     A subpoena by the OCE to WOW requesting subscriber information for the IP address, 24.96.246.251, logging into this LiveMe account. Wide Open West then provided subscriber information as follows: David Cruz, 106 Casa Pl, Panama City Beach, FL 32413, 931-981-3481.

32.     A software program used by the OCE recorded the online activity, chats, and images identified within LiveMe, and a DVD recording was sent to your Affiant via FedEx. The DVD recording shows the OCE viewing the profile of Best Links on LiveMe, then going into Best Links FAM chatrooms. The OCE went into Best Links FAM chatroom "join" and copied a Mega.nz link posted in the chatroom by Best Links. The OCE then uploaded the copied Mega.nz link on a separate webpage and multiple videos described in the paragraph above appeared. Best Links shared his Mega.nz link with the other 93 members in the FAM chatroom "join." Members of the group can access the child pornography via clicking on the Mega.nz link and downloading the child pornography videos.

33.     A subpoena by the OCE to Google requesting subscriber information for email addresses fanticshd@gmail.com used to register the Best Links LiveMe account and palmercoburn@gmail.com recovery email to "fanticshd@gmail.com" provided subscriber information as follows:

GOOGLE SUBSCRIBER DATA (fanticshd@gmail.com)

• NAME: Hype Central

- EMAIL: fanticshd@gmail.com
- RECOVERY EMAIL: palmercoburn@gmail.com
- RECOVERY SMS: 850-512-6760

GOOGLE SUBSCRIBER DATA (palmercoburn@gmail.com)

- NAME: Palmer Coburn
- CREATED ON: July 12,2010
- RECOVERY EMAIL: utubeedward@gmail.com
- RECOVERY SMS: 850-358-1577

34.     An open source check done by the OCE linked the recovery email for palmercoburn@gmail.com, utubeedward@gmail.com, to a Facebook account with the name Palmer Coburn. The Facebook page states that Palmer Coburn is from Ann Arbor, Michigan, and currently lives in Pensacola, Florida.

35.     A subpoena by the OCE to T-Mobile requesting subscriber information for phone number 850-512-6760 used to register the email account with Google. T-Mobile then provided subscriber information as follows: NAME: Consuela Coburn; ADDRESS: 34 Patton Dr.; Pensacola, FL 32507; LENGTH OF SERVICE: March 18, 2019 – Current

36.     A search of the Florida Driver License and Vehicle Information Database (DAVID) for the SUBJECT PREMISES address revealed that an individual named Consuela Bernetta Coburn, date of birth February 25, 1971, list the SUBJECT PREMISES address as her residence. Within the document section of

DAVID for Consuela Bernetta Coburn, it shows her lease agreement for 106 Casa PL starting in November 2019 with David Cruz, the lessor. Within the documents section of DAVID for Palmer Edward Coburn shows a birth certificate showing Consuela Bernetta Coburn as his mother.

37.    During your Affiant's verification of residency, the Affiant identified that the Subject moved from 106 Casa Pl, Panama City Beach, FL to 122 Kelly Street, Panama City Beach FL. On May 27, 2020, your Affiant drove by 106 Casa Pl, Panama City Beach and identified an out of state license plate not associated with Consuela Coburn or Palmer Coburn parked in 106 Casa Pl's parking spot. It is common for vacation homes near the beach to rent their vacation homes for longer duration during the off-peak winter season.

38.    On May 28, 2020, your Affiant subpoenaed LiveMe requesting recent subscriber data for account "8998729." The response from LiveMe identified the most recent and consistent IP addresses logging into this account belonging to Wide Open West internet. LiveMe subscriber data revealed the following: USERNAME: AyyBenjii; SID: 8998729; REGISTRATION DEVICE: iPhone; EMAIL: fanticshd@gmail.com; IP ADDRESSES: 69.73.52.248 (WOW).

39.    On June 1, 2020, a subpoena by your Affiant to WOW requesting subscriber information for the IP address, 69.73.52.24, logging into this LiveMe

15

account. WOW then provided subscriber information as follows: Coburn Palmer, 120 Kelly St, Panama City Beach, FL 32413, 850-358-0733.

40.    A search of the Florida Driver License and Vehicle Information Database (DAVID) shows a change in the mailing address for Consuela Bernetta Coburn to 122 Kelly Street, Panama City Beach, FL 32413. 122 Kelly Street is the street facing residence and 120 Kelly Street is a detached garage house located on 122 Kelly St, Panama City Beach, FL 32413. On June 23, 2020, your Affiant identified a black Jeep, license plate LAIL62, parked in front of the detached garage house. Per DAVID, license plate LAIL62 is registered to Consuela Bernetta Coburn. On July 22, 2020 and July 23, 2020, agents observed a red Nissan Sentra with Illinois license plate FP70604 parked at the garage house. Agents determined the vehicle is a rental and verified it is rented to Consuela Bernetta Coburn.

## CHILD PORNOGRAPHY COLLECTOR CHARACTERISTICS

41.    Many individuals who possess child pornography are sexually attracted to children. Their sexual arousal patterns and erotic imagery focus, in part or in whole, on children. Any collection may be exclusively dedicated to children of a particular age/gender or it may be more diverse, representing a variety of sexual preferences, including children.

42.    These individuals may derive sexual gratification from actual physical contact with children as well as from fantasy involving the use of pictures or other

16

visual depictions of children or from literature describing sexual contact with children. The overriding motivation for the collection of child pornography may be to define fuel and validate the collectors most cherished sexual fantasies involving children.

43.     Visual depictions may range from fully clothed depictions of children engaged in non-sexual activity to nude or partially nude depictions of children engaged in explicit sexual activity. In addition to child pornography, these individuals are also likely to collect other paraphernalia related to their sexual interest in children. This other material is sometimes referred to as "child erotica" which is defined as any material, relating to children, that serves a sexual purpose for a given individual. It is broader and more encompassing than child pornography, but at the same time the possession of such corroborative material, depending on the context in which it is found, may be behaviorally consistent with the offender's orientation toward children and indicative of his/her intent. It includes things such as fantasy writings, letters, diaries, books, sexual aids, souvenirs, toys, costumes, drawings, cartoons and non-sexually explicit visual images.

44.     Child pornography collectors may reinforce their fantasies, often by taking progressive, overt steps aimed at turning the fantasy into reality in some or all of the following ways: collecting and organizing their child-related material; masturbating while viewing the child pornography; engaging children, online and

elsewhere, in conversations, sometimes sexually explicit conversations, to fuel and fortify the fantasy; interacting, both directly and indirectly, with other like-minded adults through membership in organizations catering to their sexual preference for children thereby providing a sense of acceptance and validation within a community; gravitating to employment, activities and/or relationships which provide access or proximity to children; and frequently persisting in the criminal conduct even when they have reason to believe the conduct has come to the attention of law enforcement. These are need driven behaviors to which the offender is willing to devote considerable time, money and energy in spite of risks and contrary to self-interest.

45.     Child pornography collectors almost always maintain and possess their material in the privacy and security of their homes or some other secure location such as their vehicle(s) where it is readily available. The collection may include sexually explicit or suggestive materials involving children, such as photographs, magazines, narratives, motion pictures, video tapes, books, slides, drawings, computer images or other visual media. This is most easily accomplished in the privacy of his own home, and it may involve password/encryption protected devices that require biometrics or entry codes. This is particularly true in cases involving cellular telephones as devices of choice – which is believed to be relevant herein as the crimes were committed via LiveMe, which is a social media application often utilized on a mobile device. Thus, it may be necessary to press the users finger, scan

18

the users face for facial recognition, or scan the irises for iris recognition of the user of the device found during the search to a device's sensor in an attempt to unlock the device for the purpose of executing the search authorized by this warrant. Attempting to unlock the relevant device(s) via biometrics of the user may be necessary because the government may not otherwise be able to access the data contained on those devices for the purpose of executing the search authorized by this warrant.

46. Because the collection reveals the otherwise private sexual desires and intent of the collector and represents his most cherished sexual fantasies, the collector rarely, if ever, disposes of the collection. Individuals who use a collection in the seduction of children or to document that seduction treat the materials as prized possessions and are especially unlikely to part with them. And even if a child pornography collector does delete files from his hard drive or other electronic media, a computer expert can still retrieve those files using forensic tools.

47. Based on the information obtained in the investigation, as detailed in this Affidavit, including the images and videos recovered by the undercover online agent, it is Your Affiant's opinion that Palmer Edward Coburn has child pornography collector characteristics. As such, images, videos, and indicia of child pornography are expected to be found on or within devices seized within the SUBJECT PREMISES.

# COMPUTER DATA

48.     As described in the foregoing paragraphs and in Attachment B, this application seeks permission to search and seize records that might be found on the Subject Premises, in whatever form they are found. One form in which the records might be found is stored on a computer's hard drive or other storage media. Some of these electronic records might take the form of files, documents, and other data that is user-generated. Some of these electronic records, as explained below, might take a form that becomes meaningful only upon forensic analysis.

49.     Based on my knowledge, training, and experience, and in consultation with other agents, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space, that is, in space on the storage medium that is not currently being used by an active file for long periods of time before they are

overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

50.     Wholly apart from user-generated files, computer storage media, in particular, computers' internal hard drives contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. This evidence can take the form of operating system configurations, artifacts from operating system or application operations, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

51.     Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

52.     As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for evidence that establishes how computers were used, the purpose of their use, who used them, and when.

53.     Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processor, picture, and movie files), computer storage media can contain other forms of electronic evidence, such as the following:

a.     Forensic evidence of how computers were used, the purpose of their use, who used them, and when they were used, as described further in Attachment B, called for by this warrant. Data on the storage medium not currently associated with any file can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, email programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

b.    Forensic evidence on a computer or storage medium can also indicate who has used or controlled the computer or storage medium. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, email, email address books, "chat," instant messaging logs, photographs, and correspondence (and the data associated with the foregoing, such as file creation and last accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time.

c.    Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs (and associated data) that are designed to eliminate data may be relevant to establishing the user's knowledge or intent.

## SPECIFICS OF SEARCH AND SEIZURE OF COMPUTER SYSTEMS

54.    Searching storage media for the evidence described in Attachment B may require a range of data analysis techniques. In most cases, a thorough search for information stored in storage media often requires agents to seize most or all electronic storage media (and related peripherals) and later review the media

consistent with the warrant. In lieu of seizure, it is sometimes possible to make an image copy of storage media. Generally speaking, forensic imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

     a.    The nature of evidence – As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly search storage media to obtain evidence, including evidence that is not neatly organized into files or documents. Just as a search of a premises for physical objects requires searching the entire premises for those objects that are described by a warrant, a search of this premises for the things described in this warrant will likely require a search among the data stored in storage media for the things (including electronic data) called for by this warrant. Additionally, it is possible that files have been deleted or edited, but

that remnants of older versions are in unallocated space or slack space. This, too, makes it exceedingly likely that, in this case, it will be necessary to use more thorough techniques.

b.     The volume of evidence – Storage media can store the equivalent of millions of pages of information. Additionally, a suspect may try to conceal criminal evidence. For example, he or she might store it in random order with deceptive file names. This may require analysts to peruse all the stored data to determine which particular files are evidence or instrumentalities of crime. This sorting process can take weeks or months, depending on the volume of data stored, and it would be impractical and invasive to attempt this kind of data search on-site.

c.     Technical requirements – Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on-site. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

d.     Variety of forms of electronic media – Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

e.     The seizure of peripherals is necessary because the peripheral devices that allow users to enter or retrieve data from the storage devices vary widely in their compatibility with other hardware and software. Many system storage devices require particular input/output (I/O) devices to read the data on the system. It is important that analysts be able to properly re-configure the system as it now operates in order to accurately retrieve the evidence contained therein. In addition, analysts need the relevant system software (operating systems, interfaces, and hardware drivers) and any applications software that may have been used to create the data (whether stored on hard drives or on external media), as well as all related instruction manuals or other documentation and data security devices.

55.     Based on the foregoing, and consistent with Fed. R. Crim. P. 41(e)(2)(B), if officers executing the warrant conclude that it would be impractical to review the hardware, media, or peripherals on-site (as I anticipate will be the case), any warrant that issues as a result of this application would permit officers to create an electronic "image" of the computer and then to conduct an off-site search for the things described in the warrant from the "mirror image" copy at a later date. If on-

site imaging proves impractical, or even impossible for technical reasons, then the agents would seize the hardware, media, and peripherals that the agents believe must be seized to permit the agents to locate the things described in Attachment B at an off-site location.

56. Any storage media that is determined to have been used to produce or possess child pornography is an instrumentality of the crime and will be seized and retained pursuant to the warrant. Further, any storage media that contains contraband will be seized and retained pursuant to the warrant. In addition, there is probable cause to believe that the computer and its storage devices, the monitor, keyboard, and modem are all instrumentalities of the crime(s), within the meaning of 18 U.S.C. §§ 2252 through 2256 and should all be seized as such.

## BIOMETRIC ACCESS TO DEVICES

57. This warrant permits law enforcement to compel Palmer Edward Coburn to unlock any DEVICES requiring biometric access subject to seizure pursuant to this warrant. The grounds for this request are as follows:

    a. I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password.

27

These biometric features include fingerprint scanners, facial recognition features and iris recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

b. If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

c. If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face. For example, this feature is available on certain Android devices and is called "Trusted Face." During the Trusted Face registration process, the user holds the device in front of his or her face. The device's front-facing camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the front-facing camera detects a face with

characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Trusted Face.

d. If a device is equipped with an iris-recognition feature, a user may enable the ability to unlock the device with his or her irises. For example, on certain Microsoft devices, this feature is called "Windows Hello." During the Windows Hello registration, a user registers his or her irises by holding the device in front of his or her face. The device then directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data based on patterns within the user's irises. The device can then be unlocked if the infrared-sensitive camera detects the registered irises. Iris-recognition features found on devices produced by other manufacturers have different names but operate similarly to Windows Hello.

e. In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal

activities and thus have a heightened concern about securing the contents of a device.

f.      As discussed in this Affidavit, your Affiant has reason to believe that one or more digital devices will be found during the search. The passcode or password that would unlock the DEVICES subject to search under this warrant currently is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the DEVICES, making the use of biometric features necessary to the execution of the search authorized by this warrant.

g.      I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when: (1) more than 48 hours has elapsed since the device was last unlocked; or, (2) when the device has not been unlocked using a fingerprint for 8 hours and the passcode or password has not been entered in the last 6 days. Similarly, certain Android devices cannot be unlocked with Trusted Face if the device has remained inactive for four hours. Biometric features

from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

h.      Due to the foregoing, if law enforcement personnel encounter any DEVICES that are subject to seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, this warrant permits law enforcement personnel to: (1) press or swipe the fingers (including thumbs) Palmer Edward Coburn to the fingerprint scanner of the DEVICES found at the premises; (2) hold the DEVICES found at the premises in front of the face of Palmer Edward Coburn and activate the facial recognition feature; and/or (3) hold the DEVICES found at the premises in front of the face of Palmer Edward Coburn and activate the iris recognition feature, for the purpose of attempting to unlock the DEVICES in order to search the contents as authorized by this warrant. The proposed warrant does not authorize law enforcement to compel that Palmer Edward Coburn state or otherwise provide the password or any other means that may be used to unlock or access the DEVICES. Moreover, the proposed warrant does not authorize law enforcement to compel Palmer Edward Coburn to identify the specific

biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the DEVICES.

58. Furthermore, law enforcement personnel will compel the use of Palmer Coburn's biometric features only if (a) the procedure is carried out with dispatch and in the immediate vicinity of the premises to be searched, and if, at time of the compulsion, law enforcement personnel has (b) reasonable suspicion that Palmer Coburn has committed a criminal act that is the subject matter of the requested search warrant, and (c) reasonable suspicion that Palmer Coburn's biometric features will unlock the respective device.

## CONCLUSION

59. Your Affiant respectfully submits there is probable cause to believe that contraband, evidence, fruits and instrumentalities of violations of Title 18, United States Code, §§2252A(a)(2) and (a)(5)(B) will be found at the premises located at 122 Kelly Street, Panama City Beach, Florida 32413, or within any structure, vehicle or container on this property.

59. Therefore, Your Affiant respectfully request that the attached warrant be issued authorizing the search of the SUBJECT PREMISES, which are more particularly described in Attachment A and grant permission to seize the items described in Attachment B.

60.   Your Affiant further submits that early disclosure of the contents of this affidavit may compromise an ongoing investigation of this matter. Further, given the sensitive nature of the information contained herein, your Affiant request that the affidavit in support of this search warrant remain sealed until further order of the Court.

Further sayeth your Affiant naught.

SA _S._____

Stephen Troy Ward
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me
This _27th_ day of July, 2020.

_/s/ Michael J. Frank_
MICHAEL J. FRANK
United States Magistrate Judge